IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD B. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 5881 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| ANDREW SAUL, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Ronald B., moves for summary judgment seeking reversal and remand of the final decision of defendant, the Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits ("DIB") (doc. # 14; doc. # 15: Pl.'s Summ. J. Mem.). The Commissioner has filed a cross motion for summary judgment asking us to affirm his decision (doc. # 18; doc. # 19: Def.'s Summ. J. Mem.), and Mr. B. has filed a reply (doc. # 23: Pl.'s Reply). For the following reasons, we grant Mr. B.'s motion, deny the Commissioner's motion, and remand the case for further proceedings.

I.

On October 31, 2014, Mr. B. applied for DIB, alleging disability due to multiple right shoulder surgeries, chronic pain in his right shoulder and arm, retinal detachment in his right eye, diabetes, and obesity (R. 114-15, 130, 153, 246). Although initially alleging a disability onset date of September 12, 2012, Mr. B. shortly thereafter amended his alleged onset date to February 10,

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. https://www.ssa.gov/agency/commissioner.html (last visited Aug. 9, 2019). Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Commissioner Saul as the named defendant.

[2] On October 29, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 6).

2014 (R. 229, 232). The Social Security Administration ("SSA") denied Mr. B.'s application at the initial and reconsideration stages of review, after which Mr. B. requested a hearing before an Administrative Law Judge ("ALJ") (R. 130, 145, 148-51, 153-56, 158-59). On June 21, 2017, the ALJ held a hearing at which Mr. B. and a vocational expert ("VE") testified (R. 65-113). On September 18, 2017, the ALJ issued a decision denying Mr. B.'s DIB claim (R. 15-33). The Appeals Council denied Mr. B.'s request to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (R. 1-6). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Mr. B. was born on May 5, 1965 (R. 229). He is between 5'11" and 6'1" tall and has weighed between approximately 230 and 300 pounds (*see, e.g.*, R. 846 (January 2014 record reporting a height of 71 inches and weight of 230 pounds); R. 908 (August 2015 record reporting a height of 71 inches and weight of 264 pounds); R. 1031 (December 2016 record reporting a height of 6'1" and weight of 302 pounds)). He is right-handed (R. 81). After graduating high school in 1983, Mr. B. obtained a commercial driver's license ("CDL") in 1988 and worked as a commercial truck driver (R. 86, 91-92, 103, 233-35, 237, 239-40, 247, 265; *see also* R. 366 (June 2013 record noting that Mr. B. had been employed as a semi-tractor trailer driver for 26 years)).

### A.

In September 2012, Mr. B. injured his right shoulder while off-loading corrugated boxes from a truck (R. 366, 425). About six months later, in March 2013, Michael Maday, M.D., an orthopedic surgeon, performed rotator cuff surgery on Mr. B.'s right shoulder (R. 250, 711-13). Despite the right shoulder injury and surgery, Mr. B. continued to work as a truck driver in some capacity until February 9, 2014 (R. 79-80, 232, 234-35, 237, 240; *see also* R. 426 (October 2013

2

record noting that Mr. B. "has not returned to work full duty but is currently working light duty")).[3] The next day, on February 10, 2014 (which is also Mr. B.'s amended disability onset date), Dr. Maday performed a second rotator cuff surgery on Mr. B.'s right shoulder (R. 674-76). In May and June 2014, Mr. B. was taking tramadol and ibuprofen for his right shoulder pain, and his doctor advised him to continue to do so (R. 311-14).

In July 2014, Mr. B. presented to Preeti Poley, M.D., for evaluation of decreased right-eye vision that he had been experiencing since April 2014 (R. 771). Dr. Poley noted that Mr. B. had cataracts in both eyes and a detached retina in his right eye, and she planned for Mr. B. to have the cataract in his right eye removed and then have another surgery to repair the retina (*Id.*). Dr. Poley further explained that the primary goal of surgery was to repair the retina and prevent blindness; even with surgery, she did not expect Mr. B.'s vision to improve because of the duration of the retinal detachment (*Id.*). In August 2014, Dr. Poley operated on Mr. B. to repair the detached retina in his right eye (R. 760-61, 786).

In October 2014, Dr. Maday completed a residual functional capacity questionnaire regarding Mr. B.'s shoulders and hands (R. 1049-51). Dr. Maday diagnosed Mr. B. with a full rotator cuff tear and an AC joint derangement (R. 1049). Dr. Maday stated that Mr. B. had numbness in his fingers and no strength in his right arm and shoulder (R. 1049, 1051). According to Dr. Maday, Mr. B. could only lift 10-15 pounds and could not reach overhead with his right arm (R. 1049-50).

---

[3] In his DIB application, Mr. B. asserted that he stopped working on September 12, 2012 because of his conditions (R. 246). This assertion, as well as Mr. B.'s initial assertion that he became disabled on this date (R. 229), appear to coincide with the date Mr. B. suffered his work-related right-shoulder injury in September 2012 (*see* R. 366 (identifying the date of incident as September 11, 2012); R. 425 (identifying the alleged date of injury as September 13, 2012)).

In March 2015, Mr. B. underwent cataract surgery on his left eye (R. 801, 813). The same month, Mr. B. reported to the SSA that he took oxycontin (a brand name for oxycodone) and tramadol for pain (R. 248). The next month, April 2015, Mr. B. again reported to the SSA that he was taking oxycodone (325 mg) and tramadol (R. 271). He also reported that he could not lift his right arm over his head or lift over 15 pounds and that he still had a hard time seeing (R. 264, 269).

In August 2015, non-examining state agency consultants Jerda Riley, M.D., and Craig Billinghurst, M.D., reviewed Mr. B.'s medical evidence at the initial stage of SSA review (R. 114-29). Although the doctors found that Mr. B. had one or more medically determinable impairments and exhibited various exertional, postural, visual, and environmental limitations, they ultimately determined that Mr. B. was not disabled (R. 121-29).

In September 2015, non-examining state agency consultant Calixto Aquino, M.D., reviewed the medical evidence at the reconsideration stage of SSA review (R. 131-44). He too concluded that Mr. B. had one or more medically determinable impairments and exhibited various functional limitations (R. 137-42). Dr. Aquino opined that Mr. B. could lift and/or carry 20 pounds occasionally and 10 pounds frequently and would be limited to occasional pushing, pulling, and reaching with his right arm (R. 139-40). Dr. Aquino also opined that Mr. B. could stand, walk, or sit for about 6 hours in an 8-hour workday; occasionally climb ramps and stairs, kneel, crouch, and crawl; frequently balance and stoop; and never climb ladders, ropes, or scaffolds (R. 139). Ultimately, though, Dr. Aquino also determined that Mr. B. was not disabled (R. 142-43).

Around the same time, Mr. B. reported that he took tramadol for pain (R. 278). The following month, October 2015, Mr. B. again underwent another retinal surgery on his right eye (R. 927-29). This surgery was followed by another eye surgery in January 2016, when Mr. B. underwent cataract surgery on his right eye (R. 945).

In June 2016, Mr. B. returned to work as a truck driver (R. 78-79, 88-89, 92-93, 238).[4] Over the next five to six months, he made about 30 truck runs (R. 92-94, 1047). During this time, in October 2016, Mr. B. underwent YAG laser capsulotomy on both eyes (R. 961-62). On November 24, 2016, Mr. B. fell climbing onto the trailer of the truck and injured his right leg and knee (R. 78, 89-90, 1040, 1047). Mr. B. has not worked since then.

In December 2016, Mr. B. presented to orthopedic surgeon Jay Brooker, M.D., for evaluation of his right knee (R. 937). Dr. Brooker noted that an MRI and x-rays "revealed degenerative findings and a degenerative meniscal tear that occurred as a result of" Mr. B.'s November 2016 work injury (*Id.*). At a follow-up visit a few weeks later, Dr. Brooker reported that weight bearing films revealed that Mr. B.'s right knee was "bone on bone with medial joint space loss and osteophyte formation" (R. 938). Dr. Brooker noted that Mr. B. had not had symptoms prior to his recent injury, and he stated that the work injury significantly exacerbated Mr. B.'s right-knee arthritis (*Id.*). Dr. Brooker also surmised that Mr. B.'s "repetitive heavy lifting, climbing, crouching and kneeling" over his 30 years of truck driving were probably "the main contributor[s] to the wear and tear in his knee" (*Id.*).

In January 2017, Mr. B. saw Dr. Brooker for another follow-up visit (R. 939). Dr. Brooker stated that the meniscal tear Mr. B. suffered as a result of his November 2016 injury was probably "just the last straw" and the injury "exacerbated his arthritis to the point where he is unable to

---

[4] Mr. B.'s hearing testimony on this point is less than clear. In response to the question "[I]s it correct that you've not worked after February of 2014?," Mr. B. responded "No, until June of 2016" (R. 78). And in response to the question "[S]o between February of 2014 and then June of 2016 when you went back to try to work, is it correct, you weren't working during that time period?," Mr. B. responded "No" (R. 78-79). Mr. B.'s earnings records, however, show that he did not earn any money in 2015 and for at least a portion of 2016 (R. 237, 240). Mr. B. was also identified as a "new hire" at a trucking company in June 2016 (R. 238). Given this documentary evidence, we interpret Mr. B.'s responses (which were to questions phrased in the negative) as indicating that he did not work from February 2014 to June 2016, and that he went back to work in June 2016 (*see also* R. 23 (statement by the ALJ that Mr. B. testified that "he went back to work to drive a truck" in 2016)).

5

work" (*Id.*). Dr. Brooker recommended a right total knee replacement and indicated that until Mr. B. had one, "he is not going to be able to function" (R. 939, 1048).

In March 2017, in connection with workers compensation and at the request of Zurich North America, Mr. B. underwent an independent medical examination performed by Brian Forsythe, M.D. (R. 1039-48). At the examination, Mr. B. reported that he had not had any treatment for his right knee before his November 2016 work injury (R. 1040). Dr. Forsythe recommended that Mr. B. return to full duty work without restrictions and opined that Mr. B. was at maximal medical improvement as it related to his right knee and the work injury (R. 1042). In April 2017, however, Sandra McGowan, M.D., (who Mr. B. identified as his primary doctor) and the orthopedics group at Advocate Medical Group evaluated Mr. B. and "recommended that he not return to work at this time" (R. 97, 1062).

On June 6, 2017, Mr. B. presented to Joseph D'Silva, M.D., complaining of severe right knee pain (R. 46-47). Dr. Silva diagnosed Mr. B. with knee osteoarthritis (R. 47). He further noted that Mr. B. ambulated with a cane and had a moderately antalgic gait (R. 46-47).

### B.

At the June 21, 2017 hearing before the ALJ, Mr. B. testified that when he stopped working in February 2014, he could not hold a plate with his right hand, as it would cause pain in his shoulder, elbow, and neck (R. 80-81). He underwent physical therapy (which did not work), stimulation, and massage; he also took medication, including oxycontin for pain (R. 81-82). The oxycontin made Mr. B. hallucinate, though, so his doctors took him off it and prescribed him Norco (R. 82-84).[5]

---

[5] Norco is a combination of hydrocodone and acetaminophen. Hydrocodone and Acetaminophen (Oral Route), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited Aug. 9, 2019). It is "used to relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated." *Id.*

Mr. B. testified that in early 2014, he "was watching TV and then all of a sudden," he lost vision in his right eye (R. 84). Mr. B. further testified that the vision has not come back in his right eye at any point since the beginning of 2014 and that his eye doctor told him that he would never regain sight in his right eye (R. 84-86). All Mr. B. sees with his right eye is a white light, and he cannot see anything to the right (R. 85, 87). Because of his limited right-eye vision, Mr. B. bumps into things when he walks (R. 87-88). Mr. B. also testified that he used to have problems with his left eye, but those went away after his October 2016 surgery (R. 85-86).

As for his knees, Mr. B. testified that his doctor said that he has degenerative joint disease (R. 96). He further testified that he has not yet had any knee surgeries and, although he is trying to get a knee replacement, his doctors say he is too young to do so (*Id.*). Mr. B. showed up to the hearing with a cane and testified that Dr. McGowan told him to use (but did not prescribe) the cane (R. 96-97). Mr. B. has used the cane regularly since his November 2016 work injury (R. 97).

Mr. B. testified that he returned to work driving trucks in June 2016 despite his right shoulder and eye issues because his "bills got, just, totally outrageous," and he "had no other means for paying" them (R. 88-89). Mr. B. also testified that he had his CDL as of June 2016 and still had one as of the hearing (in June 2017), but he cannot drive because he cannot pass the physical examination (R. 94).

### C.

In denying Mr. B's DIB claim, the ALJ followed the familiar five-step process for assessing disability. *See* 20 C.F.R. § 404.1520(a). As an initial matter, the ALJ determined that Mr. B.'s date last insured was December 31, 2019 (R. 18, 20). Then, at Step One, the ALJ determined that Mr. B had not engaged in substantial gainful activity since his alleged disability onset date, February 10, 2014 (R. 20). At Step Two, the ALJ determined that Mr. B. suffered from

the following severe impairments: residuals from multiple surgeries to his right shoulder causing shoulder and arm pain; degenerative joint disease in the right shoulder; diabetes mellitus; degenerative joint disease in the right knee; retinal detachment in his right eye; and obesity (*Id.*). At Step Three, the ALJ determined that none of Mr. B.'s impairments, individually or in combination, met or equaled a listed impairment (R. 21-22).

Between Steps Three and Four, the ALJ evaluated Mr. B.'s residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). The ALJ concluded that Mr. B. retains the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with several exceptions (R. 22). Specifically, Mr. B. can lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can stand, walk, and sit for six hours in an eight-hour workday; he cannot climb ladders, ropes, or scaffolds, but he can occasionally climb ramps and stairs; he can occasionally balance, stoop, kneel, crouch, and crawl; he can occasionally reach in all directions, including overhead with his right upper extremity; he has frequent depth perception, near and far vision, and frequent acuity field of vision in his right eye; he must avoid concentrated exposure to vibration; and he should avoid even moderate exposure to operating moving vehicles, unprotected heights, and hazardous machinery (*Id.*). At Step Four, the ALJ found that Mr. B. could not perform his past relevant work as a truck driver (R. 27). At Step Five, however, the ALJ concluded that Mr. B. could perform other jobs that exist in significant numbers in the national economy, such as a courier clerk, parking lot attendant, and ticket seller (R. 27-28). Thus, the ALJ determined that Mr. B. was not disabled (R. 28).

### III.

Courts review ALJ decisions deferentially to determine if they apply the correct legal standard and are supported by "substantial evidence," which is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). To satisfy the "substantial evidence" standard, "the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the [ALJ] by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Mr. B. argues that the ALJ's decision should be reversed and remanded because the ALJ (1) improperly assessed Mr. B.'s subjective symptom allegations; and (2) failed to set forth a supported rationale for her RFC findings (Pl.'s Summ. J. Mem., at 5-14). We agree that the ALJ did not properly assess Mr. B.'s subjective symptom allegations. Because we find remand necessary on this basis, we do not reach Mr. B.'s additional arguments for remand.

## IV.

We will overturn an ALJ's subjective symptom assessment "only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Even so, we cannot uphold a subjective symptom assessment if the ALJ fails to build an "accurate and logical bridge" between the evidence and her conclusions. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *see Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (a ruling is not supported by substantial evidence if the ALJ "fails to build a logical and accurate bridge between the evidence and conclusion"). An ALJ "must adequately explain [her subjective symptom assessment] by discussing specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th

Cir. 2013), and a failure to do so "is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

Here, the ALJ concluded that Mr. B.'s "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (R. 23). At the outset, we reject Mr. B.'s contention that the ALJ's use of the "not entirely consistent" phrasing indicates that she applied the wrong evidentiary standard in evaluating his symptoms (Pl.'s Summ. J. Mem., at 5-6; Pl.'s Reply, at 1-2). Although the "not entirely consistent" phrasing is meaningless boilerplate language that does not aid our review of the ALJ's subjective symptom evaluation, *see Dejohnette v. Berryhill*, No. 16 C 11378, 2018 WL 521589, at *5 (N.D. Ill. Jan. 22, 2018), it "does not automatically undermine or discredit the ALJ's ultimate conclusion if [s]he otherwise points to information that justifies" her subjective symptom assessment. *Pepper*, 712 F.3d at 367-68; *see also Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony").[6]

The ALJ provided enough of an explanation for her adverse subjective symptom assessment that her use of the "not entirely consistent" boilerplate does not itself require remand. Nonetheless, we cannot uphold the ALJ's subjective symptom assessment because her explanation failed to build an "accurate and logical bridge" between the evidence and her conclusions. *See Minnick*, 775 F.3d at 937 ("Without a logical bridge between the evidence and the ALJ's

---

[6] Indeed, the Seventh Circuit has on numerous occasions upheld ALJ decisions that use the "not entirely consistent" and similar boilerplate language. *See, e.g., Burmester v. Berryhill*, 920 F.3d 507, 509-10 (7th Cir. 2019) (allegations were "not fully substantiated in the record"); *Hall v. Berryhill*, 906 F.3d 640, 643-44 (7th Cir. 2018) (symptom statements were "not fully credible"); *Cooley v. Berryhill*, 738 F. App'x 877, 880, 882 (7th Cir. 2018) (testimony was "not entirely consistent with the overall record"); *Summers*, 864 F.3d at 528 (subjective complaints were "not entirely credible"); *Reed v. Colvin*, 656 F. App'x 781, 786-88 (7th Cir. 2016) (statements were "not entirely consistent with or supported by the medical and other evidence").

conclusion, we lack a sufficient basis upon which to uphold the ALJ's determination of [the claimant's] credibility"); *Shramek*, 226 F.3d at 811.

## A.

The most fundamental flaw in the ALJ's subjective symptom assessment concerns her evaluation of Mr. B.'s work history. *See, e.g., Taylor v. Berryhill*, No. 17 C 9098, 2018 WL 5249234, at *6 (N.D. Ill. Oct. 22, 2018) ("A claimant's work history is a relevant factor in evaluating [the] claimant's subjective symptoms"). According to the ALJ, Mr. B. "admitted that he worked full-time as a truck driver until November 2016," and this purported "ability to work for over 2 years since his onset date" (in February 2014) showed that Mr. B. was "not as limited as he claims and is able to work at least at a light exertional capacity since his truck driving job was deemed a medium exertional level job" (R. 26).

But Mr. B. did *not* work "for over 2 years since his onset date," *i.e.*, from February 2014 through November 2016, as the ALJ asserted (R. 26). Indeed, Mr. B.'s earnings records during that time period show that he did not earn any money in 2015 and for at least a portion of 2016 (R. 237, 240)—which would not have been the case if Mr. B. had worked continuously from February 2014 through November 2016. Instead, Mr. B. stopped working in February 2014, and, after more than two years of not working, he returned to work in June 2016 (R. 78-79, 88-89, 92-93, 237-38, 240; *see also* R. 23 (statement by the ALJ that Mr. B. testified that "he went back to work to drive a truck" in 2016)).

Nor does the evidence support the ALJ's assertion that Mr. B.'s work after his alleged disability onset date was *full-time* work. From June through November 2016, Mr. B. made about 30 truck runs, which he characterized as "[n]ot a lot" and less than what he would usually carry out when he previously worked (R. 93-94). And by November 2, 2016, Mr. B. had only been paid

11

$3,686.00 for his approximately five months of work (R. 92-93, 238). This amount, extrapolated for an entire year, is much less than Mr. B.'s yearly earnings when he worked full-time before his alleged disability, further showing that Mr. B.'s work from June through November 2016 was in a less than full-time capacity (*see, e.g.*, R. 233-34, 237 (indicating that Mr. B. earned between $40,391.16 and $67,946.73 in wages every year from 2001 through 2012)).

In fact, the ALJ expressly found that Mr. B. did not engage in substantial gainful activity since February 10, 2014 (his alleged disability onset date) (R. 20), which means that Mr. B. did not perform work involving "significant and productive physical or mental duties . . . for pay or profit." *See* 20 C.F.R. § 404.1510 (defining "substantial gainful activity"). The ALJ's own "substantial gainful activity" conclusion further undermines her later assertion that Mr. B. worked full-time as a truck driver during the same time frame—as does her Step Four finding that Mr. B. could not perform his past relevant work as a truck driver (R. 27). *See Cooper v. Berryhill*, 244 F. Supp. 3d 824, 828 (S.D. Ind. 2017) ("Step four addresses whether a claimant is capable of performing past relevant work on a regular and continuing basis despite any impairment-related limitations"); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) (defining "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule"). Because the ALJ misinterpreted the evidence on this point, she failed to build a logical and accurate bridge between the evidence and her decision to discount Mr. B.'s allegations based on his post-disability work history. *Fisher*, 760 F. App'x at 477 (finding that a conclusion based on a mischaracterization of the record lacked "a logical link between the evidence and [the] conclusion"); *see also Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (explaining that a decision premised on an "incorrect interpretation of the medical evidence" is "not supported by substantial evidence").

The ALJ's decision also failed to address the fact that "[t]here is no inherent inconsistency in being both employed and disabled," and "[r]egularly working while impaired does not disprove a person's limitations[.]" *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016); *Knapp v. Berryhill*, 741 F. App'x 324, 329 (7th Cir. 2018). Mr. B. testified that he returned to work in June 2016 not because his alleged impairments had suddenly vanished, but because he "had no other means for paying [his] bills" (R. 88-89), and the ALJ made no finding that this testimony lacked credibility. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("A desperate person might force himself to work despite an illness that everyone agreed was totally disabling"). The ALJ likewise failed to explain why Mr. B.'s return to work in June 2016 did not make his allegations more credible. *See Cullinan*, 878 F.3d at 604 ("A positive work history makes a claimant *more* credible, and a desire to resume work similarly makes a claimant more credible, not less") (emphasis in original and internal citation omitted); *Weaver v. Berryhill*, 746 F. App'x 574, 576, 578-79 (7th Cir. 2018) (finding that the ALJ impermissibly inferred that the claimant "was not credible in claiming an inability to work full time" based on her post-onset part-time employment).

In addition, the ALJ failed to acknowledge Mr. B.'s twenty-plus years of continuous employment prior to his alleged February 2014 onset date (*see, e.g.*, R. 233-35, 247, 265, 366), which also favors crediting Mr. B.'s allegations. *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) ("a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability") (citations and internal quotations omitted). The Commissioner implicitly concedes the ALJ's failure to account for Mr. B.'s "steady work history," but he argues that it does not amount to reversible error (Def.'s Summ. J. Mem., at 10-11). We disagree. Although an ALJ's silence on a claimant's positive work history may not alone negate

an otherwise supported subjective symptom assessment, *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016), the ALJ was not merely silent about Mr. B.'s work history here. Rather, she discussed and relied upon what she asserted were the negative aspects of Mr. B.'s work history (his post-disability work) while, at the same time, ignoring the positive aspects of his work history (his pre-disability work). In doing so, the ALJ impermissibly cherry-picked the evidence. *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) ("ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weights against their findings").

**B.**

The ALJ's flawed assessment of Mr. B.'s work history cannot be dismissed as harmless, as it demonstrably influenced her evaluation of Mr. B.'s functional restrictions and the medical opinions in the record. *See Ghiselli*, 837 F.3d at 779 (finding that an erroneous credibility determination was not harmless because "it informed several aspects of the ALJ's findings with respect to [the claimant's] residual functional capacity and consequently her ability to perform past relevant work or to adjust to other work"); *Engstrand v. Colvin*, 788 F.3d 655, 662 (7th Cir. 2015) (finding that "the ALJ's flawed credibility finding hindered her ability to appropriately weigh other favorable evidence," including an opinion from the claimant's treating physician). For instance, the ALJ stated that "[e]ven with his right eye issues, he is still able to drive as a truck driver until November 2016," and that no further limitations were warranted (other than those imposed by the ALJ's RFC assessment) because, among other things, "he has been able to work" (R. 26). Moreover, in listing the factors that supported her RFC assessment, the ALJ identified Mr. B. "working after the onset date" as one such factor (R. 27).

14

As for medical opinions, the ALJ gave some weight to Dr. Forsythe's March 2017 opinion that Mr. B. could return to full duty without restrictions after concluding it was "consistent with the evidence," *i.e.*, Mr. B. "working full time until November 2016 as a truck driver" (R. 25). At the same time, the ALJ gave little weight to Dr. Brooker's January 2017 opinion that Mr. B. could *not* work or function until he had a knee replacement because, among other things, she found that Mr. B. "continued to work as a truck driver until November 2016" (*Id.*).[7] The ALJ likewise gave little weight to Dr. Maday's October 2014 opinion imposing restrictions on Mr. B.'s use of his right arm because, among other things, Mr. B. had "worked as a truck driver until November 2016, which would require him to use both upper extremities" (*Id.*). Mr. B.'s purported admission "that he worked full-time as a truck driver until November 2016" was also a reason the ALJ gave little weight to Dr. McGowan's April 2017 opinion that Mr. B. could not return to work (R. 26). In sum, the ALJ relied upon her incorrect interpretation of Mr. B.'s post-onset work history to give weight to an unfavorable medical opinion, and then used the same incorrect interpretation to justify giving less weight to more favorable medical opinions.[8]

The ALJ's repeated references to Mr. B.'s post-onset work history when evaluating his functional restrictions and medical opinions indicate the importance she ascribed to this aspect of the evidentiary record. As such, we are not confident that the ALJ would make the same evaluations once she acknowledges that Mr. B. did not work from February 2014 through June

---

[7] Separately, this reasoning ignores the fact that Dr. Brooker assessed Mr. B.'s ability to function and work *after* his November 2016 injury, which does not shed any light on Mr. B.'s ability to work *before* the injury, at least as it relates to using his right knee.

[8] The ALJ also discredited Dr. Brooker's and Dr. McGowan's opinions that Mr. B. could not return to work because "only the Commissioner has the ultimate authority to determine whether one can, cannot work, or is disabled" (R. 25-26). This is incorrect. Although "[w]hether a claimant qualifies for [disability] benefits is a question of law" reserved for the ALJ, a physician is permitted to opine about whether "a claimant is unable to work." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018); *Knapp*, 741 F. App'x at 327. "Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination." *Lambert*, 896 F.3d at 776.

15

2016 and that, when Mr. B. did go back to work, it was not in a full-time capacity. *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("An error is harmless only if we are convinced that the ALJ would reach the same result on remand"); *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (a flawed credibility assessment could not be deemed harmless where the court could not "be sure that the ALJ would have reached the same conclusion about [the claimant's] credibility if the information he considered had been accurate"). Remand is therefore required.

C.

We note two other aspects of the ALJ's subjective symptom assessment that also support remanding the case. *First*, the ALJ indicated that she discounted Mr. B.'s knee complaints because he used a cane without a prescription and because he had not undergone any knee surgeries: "The claimant injured his knee and has problems with both knees. However, he has not had any surgeries to his knees and a cane was not prescribed even though he uses one" (R. 23). But use of a cane does not require a prescription; thus, it was not suspicious for Mr. B. to use a cane without one. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Moreover, using a cane is consistent with knee problems for which a knee replacement is recommended (R. 939) and walking with a moderately "antalgic gait," which Mr. B. was observed to do just a few weeks before the hearing (R. 47).[9]

And Mr. B.'s failure to undergo knee surgery does not itself say anything about his allegations. *See Howard v. Berryhill*, No. 17 C 583, 2018 WL 6529284, at *10 (N.D. Ill. Dec. 12, 2018) ("A claimant does not have to undergo the most extreme form of treatment in order for her testimony to be accepted"). An ALJ must ask a claimant why he does not undergo surgery before holding that failure against him. *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Here, Mr.

---

[9] An antalgic gait is a limp adopted to avoid pain on a weight-bearing structure. *Patricia B. v. Berryhill*, No. 17 CV 50201, 2019 WL 354888, at *2 n.2 (N.D. Ill. Jan. 29, 2019) (citing *Dorland's Medical Dictionary*).

B. explained that he has "been trying to get [a] knee replacement done, but they, the doctors say I'm too young" (R. 96; *see also* R. 939 (January 2017 statement by Dr. Brooker indicating that a knee replacement was necessary)). As there is no indication that the ALJ did not believe this explanation, Mr. B.'s failure to undergo knee surgery does not shed any light on the severity of his knee pain and issues.

*Second*, and relatedly, the ALJ referred to Mr. B.'s treatment as "conservative" (R. 26-27; *see also* R. 25 (noting that certain right arm restrictions seemed extreme because Mr. B. "failed to treat or barely treated" his right shoulder "for the past 2 years")). It is unclear, though, what treatment the ALJ considered conservative or what more aggressive treatment she believed Mr. B. would have undergone had his impairments been more serious. As one judge in this District explained:

> Stating that treatment has been conservative—without more—does not provide any insight into the severity of a given condition and may even belie the condition's seriousness. Merely characterizing treatment as "conservative" fails to consider whether options would have been available and appropriate for [a claimant's] myriad impairments. Perhaps none existed. A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.

*Thomas v. Colvin*, No. 13 C 3686, 2015 WL 515240, at *4 (N.D. Ill. Feb. 6, 2015) (internal citations and quotations omitted).

Here, the ALJ did not explain why the treatments prescribed for or performed on Mr. B. qualify as conservative. For his eye impairments, Mr. B. underwent several eye surgeries over two-plus years, and for his knee problems, a doctor recommended total knee replacement surgery. As for his right shoulder, Mr. B. had already undergone two rotator cuff surgeries, and there is no evidence that additional, more aggressive treatment for his shoulder was possible. The record also indicates that Mr. B. took or was prescribed tramadol and oxycodone in 2014 and 2015 for his shoulder pain (R. 248, 271, 278, 311-14). Using that kind of strong prescription pain medication

17

may contradict "an ALJ's conclusion that a claimant only received conservative care," *Banks v. Berryhill*, No. 16 C 8330, 2017 WL 4150618, at *7 (N.D. Ill. Sept. 19, 2017), and, in fact, taking such medication "tends to bolster a claimant's credibility rather than detract from it." *Zimmerman v. Colvin*, No. 14 C 5300, 2015 WL 6163614, at *11 (N.D. Ill. Oct. 20, 2015); *see also Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) (a claimant "taking heavy doses of strong drugs[] indicates that the claimant's complaints of pain are likely credible") (internal quotations omitted).[10]

All of this is not to say that the ALJ on remand must credit all of Mr. B.'s subjective symptom allegations. On remand, the ALJ should evaluate Mr. B.'s subjective symptom allegations in accordance with SSR 16-3p. The ALJ should "explain which of [Mr. B.'s] symptoms [are] found consistent or inconsistent with the evidence . . . and how [the ALJ's] evaluation of [Mr. B.'s] symptoms led to [her] conclusions." SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016). Ultimately, the ALJ must ensure that her subjective symptom evaluation builds an accurate and logical bridge from the evidence to her conclusions in a way that a reviewing court can trace her path of reasoning. *See Clifford v. Apfel*, 227 F.3d 863, 872, 874 (7th Cir. 2000). After re-evaluating the evidence and building an "accurate and logical bridge," it may be that the ALJ comes to the same results. But the requisite bridge is missing from the ALJ's current decision, so we must remand.[11]

---

[10] Tramadol is an opioid analgesic "used to relieve moderate to moderately severe pain, including pain after surgery." Tramadol (Oral Route), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited Aug. 9, 2019). Oxycodone is a narcotic analgesic "used to relieve pain severe enough to require opioid treatment and when other pain medicines [do] not work well enough or cannot be tolerated." Oxycodone (Oral Route), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193 (last visited Aug. 9, 2019).

[11] Although we do not reach Mr. B.'s other arguments on appeal, we note separately that the ALJ gave great weight to Dr. Aquino's opinion at the reconsideration stage of review (R. 26). This opinion also appears to be the basis for the ALJ's lifting and carrying restrictions (20 pounds occasionally and 10 pounds frequently); sitting, standing, and walking restrictions (six hours in a workday); and many postural restrictions, such as Mr. B.'s ability to occasionally climb ramps and stairs, kneel, crouch, and crawl, and his inability to climb ladders, ropes, or scaffolds (*compare* R. 22 (RFC), *with* R. 139 (Dr. Aquino's opinion)).

## CONCLUSION

For the foregoing reasons, we grant Ronald B.'s motion for summary judgment (doc. # 14) and deny the Commissioner's cross motion for summary judgment (doc. # 18). We remand the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: August 12, 2019

---

Dr. Aquino, however, evaluated Mr. B.'s lifting, carrying, sitting, standing, walking, and postural abilities (abilities that all require use of the knee) in September 2015, more than a year before Mr. B. injured his right leg and knee in November 2016. Put another way, Dr. Aquino's opinion about Mr. B.'s ability to perform tasks requiring the use of his knees may have been different had he had the opportunity to consider Mr. B.'s later knee injury, resulting knee pain, and related medical records, including Dr. Brooker's observations about Mr. B.'s knee. As such, Dr. Aquino's opinion is outdated (at least as to restrictions requiring knee use), and the ALJ should not rely upon it when assessing these restrictions on remand. *Lambert*, 896 F.3d at 776 ("ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion") (internal quotations omitted).